Cantera Construction Company v. Commissioner.
Cantera Constr. Co. v. Commissioner
Docket No. 1136-65.
United States Tax Court
T.C. Memo 1967-254; 1967 Tax Ct. Memo LEXIS 7; 26 T.C.M. (CCH) 1306; T.C.M. (RIA) 67254; December 26, 1967
*7 Three of petitioner's four equal stockholders and an unrelated fourth party (Preston) entered into negotiations in July and August of 1960 to acquire land and build a building thereon to be leased to the Delaware Unemployment Compensation Commission. An option on the land was taken in petitioner's name, the Commission agreed to case the property from petitioner, and a lending agency committed itself to a permanent mortgage loan on the property. Shortly thereafter petitioner assigned the option to [*] formed partnership in which Preston had a 50-percent interest and each of petitioner's three stockholders held a 16 2/3-percent interest. The partnership thereupon exercised the option and bought the land, entered into a contract with petitioner to build the building, entered into a lease with the Commission, obtained a construction loan, and eventually took up the permanent loan commitment. In December of 1960, after the project was underway, the partners agreed to dissolve the partnership as of December 31, 1962, with Preston agreeing to take over all the partnership assets and assume all of its liabilities and the partnership was to make guaranteed payments totaling approximately *8 $100,000 to petitioner's three stockholders. Held: Petitioner did not, in substance, sell a "real estate package," consisting of the option, the agreement to lease, and the loan commitment, to Preston for the approximately $100,000 paid by Preston to petitioner's three stockholders. Petitioner is not taxable on the amounts received by its stockholders. Courtney H. Cummings, Jr., 8th Fl., Bank of Delaware Bldg., Wilmington, Del., for the petitioner. Edward L. Newberger, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in petitioner's income tax for its fiscal year ended May 31, 1961, in the amount of $39,324.78. The only issue is whether there should be included in petitioner's taxable income for its fiscal year ended May 31, 1961, the sum of $97,839.99 paid to three of petitioner's stockholders, each of whom owned 25 percent of petitioner's stock, by a partnership, West Realty Co., in which they each owned a one-sixth interest, purportedly as "guaranteed payments" upon their withdrawal from the partnership. Respondent contends that the payments received by the three individuals were actually *9 paid by the surviving partner of the partnership for a "package deal" put together by the corporate petitioner, consisting of an option to purchase land, an agreement to lease a building to be constructed thereon, and a commitment for a loan on the property. Findings of Fact Some of the facts have been stipulated by the parties and are incorporated herein by this reference. Petitioner is a corporation organized under the laws of Delaware in 1952 with its principal office at the time the petition in this case was filed in Wilmington, Del. Petitioner timely filed its Federal corporate income tax return for the fiscal year ended May 31, 1961, with the district director of internal revenue at Wilmington, Del.
Petitioner is, and has been, primarily engaged in the construction business, although its tax return for the fiscal year in issue showed a $40,257.38 capital gain from land sales as compared to $38,453.16 gross profit from construction. However, petitioner has never been engaged in the business of owning and operating office buildings under lease arrangements, and there is a definite corporate policy against engaging in such business. During the fiscal year in issue, the *10 officers and stockholders of petitioner were Domenick Cantera, Carl A. Cantera, Charles D. Cantera, and Arthur A. Carota (hereinafter sometimes referred to as Domenick, Carl, Charles, and Arthur, respectively). Carl and Charles were brothers and the sons of Domenick, while Arthur was Domenick's brother-in-law. Ownership of petitioner's stock and salaries paid to the stockholders for the fiscal year ended May 31, 1961, were as follows: Preferred
Common
Officers and
stock
stock
stockholders
Capacity
owned
owned
Salary
Domenick Cantera
President
100%
25%
0
Director
Arthur A. Carota
Secretary
none
25%
$13,590
Treasurer
Director
Carl A. Cantera
Vice President
none
25%
10,980
Director
Charles D. Cantera
Assistant Secretary
none
25%
10,980
Director
Domenick died in 1963. During the fiscal year in issue Domenick was not active in the day-to-day business, but he did participate to some extent in the overall management of petitioner. Each of the stockholders of petitioner also owned a 25-percent interest in County Investment Co., a partnership engaged in the business of leasing realty. Carl and Charles each *11 owned 33 1/3 percent of the outstanding stock of two corporations, Bellevue, Inc., and Bellevue Holding Co., which also were engaged in the business of owning and leasing real estate. Sometime in 1960 it became known that the Delaware Unemployment Compensation Commission (hereinafter sometimes referred to as Commission) was seeking office space in Wilmington. On July 11, 1960, Arthur conferred with the chairman-executive director, Albert Stetser (hereinafter sometimes referred to as Stetser), in regard thereto, and obtained details as to the Commission's need for an office building, including specifically the georgraphical area. On July 20, 1960, an option to purchase land situated at 8th and West Streets (hereinafter sometimes referred to as the land), was obtained in the name of the Branwyn Co. from the Oblates of St. Francis DeSales (hereinafter sometimes referred to as Oblates) for a consideration of $300. The Branwyn Co., as a straw party, assigned the option to petitioner on July 27, 1960. By a letter dated August 1, 1960, a proposal was submitted to the Commission for construction of a building. The letter also described in summary form some of the terms of a proposed *12 lease. This letter was followed on August 10, 1960, by a letter which modified some of these terms. Both letters were on petitioner's stationery and bore the signature "Cantera Construction Company By Arthur A. Carota." Neither letter specifically mentioned who would be the owner of the building. Attached to the August 1 letter was an appendix which identified W. Ellis Preston (hereinafter sometimes referred to as Preston), a professional architect licensed by the State of Delaware, as the architect for the project and in no other capacity. However, on various occasions subsequent to Arthur's first contact with Stetser both Arthur and Preston met with Stetser to discuss plans for the project and Stetser was told that Preston was to participate in the ownership of the project. On August 23, 1960, the Commission, meeting in special session to consider building proposals, authorized Stetser to execute a lease incorporating the proposals made in the August 1 and August 10 letters signed by petitioner. The minutes stated, inter alia: WHEREAS * * * the proposal submitted by Cantera Construction Company for a new building * * * is the most desirable of those submitted; now therefore *13 be it resolved: THAT the Chairman-Executive Director of the Commission is authorized herewith to execute an agreement to sign a lease incorporating the proposals made by the Cantera Construction Company in their letter of August 1, 1960, as modified by their subsequent letter of August 10, 1960 * * *. Pursuant to this authority, Stetser wrote a letter to petitioner dated August 30, 1960, advising it of the acceptance of the August 1 and August 10 proposals. The letter stated in part: You may consider this letter as a binding commitment to sign a lease covering such transaction after such lease has been prepared to the satisfaction of our counsel * * *. The Commission, in requesting the approval of expenditures for rental of office space on the form submitted to the U.S. Department of Labor, stated under name and address of lessor: "Cantera Construction Co., Wilmington." In order to secure long-term financing, a mortgage application was made to T. B. O'Toole, Inc. (hereinafter sometimes referred to as O'Toole), a mortgage broker in Wilmington, on September 19, 1960. The application was on petitioner's stationery and was signed "CANTERA CONSTRUCTION COMPANY BY Arthur A. Carota. *14 " The only specific references to the owners, contractor, and architect were as follows: 13. Owners: A corporation or partnership to be formed for this project. 14. Contractor: Cantera Construction Co., 1508 Pennsylvania Avenue, Wilmington, Delaware. 15. Architect: W. Ellis Preston, R.A., 903 Jefferson Street, Wilmington, Dela. On September 27, 1960, the Wilmington Savings Fund Society (hereinafter sometimes referred to as Society) wrote a letter to O'Toole. Portions of this letter are as follows: Gentlemen: Re: Mortgage Loan Application Borrower: Cantera Construction Co. Premises: N.W. Corner Eighth & Washington Streets, Wilmington, New Castle County, Delaware. We are pleased to inform you that the above application has been approved, and that we will make a loan subject to the following terms and conditions: AMOUNT
INTEREST RATE
TERM
$750,000
6% per annum
20 years
* * *
Duration of Commitment: This commitment will be effective for a period of 14 months from this date, unless extended by the Society in writing, and formal acceptance must be made by you on or before October 12, 1960. * * *
Deposit: With the acceptance of this commitment, *15 we will require a deposit of $7,500.00 which we will retain in the event you do not accept the loan by November 27, 1961. With your acceptance please forward to us the deed or deeds to the subject property. * * * On October 10, 1960, three of petitioner's four stockholders (Carl, Charles, and Arthur) and Preston, who is unrelated to any of petitioner's stockholders, signed an agreement to form the partnership of West Realty Co. (hereinafter sometimes referred to as West). The partnership agreement stated in part that: (1) The Partnership shall be for the sole purpose of acquiring, improving and leasing real property for investment purposes. * * *
(3) The Partnership shall begin on the 10th day of October, 1960, and continue until dissolved by mutual agreement. The Federal partnership information income tax returns filed by West for the taxable years ended December 31, 1960, and December 31, 1961, also both showed "October 10, 1960" entered in the space designated "A. Date business commenced." The original capital contributions and share of profits of West were as follows: Capital
Share of
Partners
Contribution
Profits
Carl A. Cantera $200
16 2/3%
Charles D. Cantera
200
16 2/3%
Arthur A. Carota
200
16 2/3%
W. Ellis Preston
600
50%
*16 On October 10, 1960, the same day the partnership agreement was signed, a letter was written to the Commission discussing the proposed completion date of the building. The letter was signed "WEST REALTY CO. By Arthur A. Carota." On October 14, 1960, an agreement of lease was made between the partners trading as West Realty Co. and the Commission. The leased premises were described as a building to be constructed at 8th and West Streets, Wilmington, property which West did not yet own. The lease contained all the essential terms which were set forth in the August 1 and August 10 proposals signed by petitioner and accepted by the Commission on August 30, 1960. On October 19, 1960, petitioner assigned the option for the purchase of the land to West for the sum of one dollar. On that same date West exercised the option by entering into a written contract with Oblates, and title to the land was taken thereunder in the partnership name, although final settlement was not until November 21, 1960. On October 21, 1960, petitioner entered into a contract with West, wherein petitioner agreed to construct the office building. The contract price was $535,000 which was later increased to $538,131.01, *17 as a result of changes in the building's specifications. The profit on this contract was consistent with profits enjoyed by petitioner under other similar construction contracts. Performance under the contract was commenced October 24, 1960, and the building was ready for occupancy by December 15, 1961. On October 17, 1960, Arthur, on behalf of West and on its stationery, wrote a letter to the vice president of the Bank of Delaware (hereinafter sometimes referred to as Bank), applying for a construction loan in the amount of $750,000. The request was granted and by November 21, 1960, West, upon the signature of each member of the partnership, had borrowed $86,000 thereunder. Of this amount $63,086.50 was used to pay the land settlement cost and $7,500 was paid to O'Toole as a deposit on the mortgage commitment. Both payments were made on November 21, 1960. By January 4, 1962, the date of the last amount obtained under the construction financing with the Bank, West had borrowed $697,000 thereunder. On November 16, 1960, five days before West paid the $7,500 deposit on the permanent mortgage commitment from Society, West forwarded to O'Toole the documents required by Society's letter *18 of September 27, 1960. The letter accompanying these documents was signed "WEST REALTY CO. By Arthur A. Carota." It was not, however, until November 9, 1961, only 18 days before the original commitment was to expire, that Society formally substituted West as the borrower in the commitment. This was done in a letter to O'Toole, which stated, inter alia: Gentlemen: Re: Mortgage Loan Application Borrower: Cantera Construction Co. Premises: N.W. Corner Eighth and West Streets, Wilmington, New Castle County, Delaware
As requested by you in your letter of October 31, 1961, we hereby approve a change in our commitment to the subject borrower to approve West Realty Company, a partnership comprised as specified by you, as mortgagor in the subject matter. On December 19, 1960, all the partners of West executed an agreement to terminate the partnership. The agreement, which amended the partnership agreement, provided in part that: (1) The partnership shall be dissolved and terminated on December 31, 1962. (2) The partnership on December 31, 1962 shall pay for and liquidate the entire interest of Arthur A. Carota, Carl A. Cantera and Charles D. Cantera in the partnership property *19 * * *. (3) The partnership shall pay the following amounts as guaranteed payments to Arthur A. Carota, Carl A. Cantera and Charles D. Cantera in liquidation of all their interest in the partnership other than their interest in partnership property: On December 28, 1960, the sum of $9,333.33 each, a total of $27,999.99. On December 15, 1961, the sum of $12,000 each, a total of $36,000. On December 15, 1962, the sum of $12,000 each, a total of $36,000. The agreement further provided that the withdrawing partners would not share in either the profits or losses of the partnership and that Preston would become the sole owner of the partnership assets. Existence of this agreement was not at this time brought to the attention of the Commission. The first of the two guaranteed payments referred to in the December 19, 1960, agreement was made by West on the dates specified therein. The final payment, which was to have been made on December 15, 1962, was accelerated and discounted at the rate of 6 percent on January 5, 1962, resulting in payments of $11,280 to each of the three retiring partners on that date. Therefore, the total of all the payments to all the withdrawing partners *20 was $97,839.99, which sum the Commissioner has included in the gross income of the petitioner for the taxable year ended May 31, 1961. The source of the funds for these payments was additional capital contributions by Preston in West. On January 10, 1962, the partners of West entered into a dissolution agreement. Pursuant thereto, settlement between Preston and the withdrawing partners was consummated. The partnership transferred all partnership assets and property to Preston and he unconditionally assumed, as of January 10, 1962, all partnership obligations and indebtedness. Arthur, Carl, and Charles were released from all liability arising thereunder. On January 19, 1962, the proceeds of the permanent mortgage commitment, as amended, were made available to Preston by Society in the amount of $750,000, which was applied as follows. The cost of paying off the Bank for money advanced for construction was $697,000. An additional $8,134.23 reflected interest due the Bank, the mortgage placement commission to O'Toole, and other minor miscellaneous expenses. The balance of the borrowed money, $44,865.77, went to Preston. One of the reasons the permanent loan exceeded the cost of the *21 project was that Preston performed his architectural services at cost. Opinion Respondent contends that all of the transactions mentioned in our Findings of Fact, starting with Arthur's original contact with the Commission, were integral steps in an overall plan and that, when viewed realistically, the substance of what occurred was that petitioner sold a valuable real estate package, consisting of an option to purchase land, an agreement to lease a building to be constructed thereon, and a commitment for a loan on the property, to Preston for $97,839.99, and that petitioner should therefore be taxed on the money paid to its three stockholders as guaranteed payments by the partnership. We disagree. We think it is clear from the evidence that while some of the initial negotiations may have been conducted in petitioner's name, or at least on petitioner's stationery, it was never intended that petitioner should participate in the transaction in any way except as the contractor to construct the building. It is even clearer that petitioner did not actually participate in any part of the transaction which gave rise to the income here involved. The uncontradicted evidence is that *22 petitioner had never engaged in the business of owning and managing rental property and that it was in no position to service a rental property in the manner required by the Commission. In fact petitioner had a firm policy not to engage in this type business because it usually involved borrowing rather large sums of money, which might severely limit petitioner's bonding capacity required to bid on construction work. It is obvious that it was never intended by the individual who conceived the idea that petitioner would be involved in this project other than as the contractor to construct the building. This is the capacity in which petitioner did participate and it realized its normal profit on such a construction contract. Yet there can be little question that when all of these transactions are viewed as a whole the original project, and the project that was carried out, was to acquire a suitable location to build a building for the Commission and to lease the property under a long-term full service lease to the Commission. While respondent argues that we should look at all of these transactions as integrated steps in an overall plan he would, in fact, have us limit our view to the *23 initial steps taken in the name of petitioner and bypass the steps that consummated the basic objective of the overall plan. Respondent does not seriously contend that the partnership was a sham, and the evidence would not support such a contention in any event. A valid and binding partnership agreement was executed, each of the partners contributed their share of capital to the partnership, the partnership bought the land, entered into a contract with petitioner to construct the building, entered into a construction loan for $750,000, on at least a part of which the partners were all personally liable, and entered into a lease with the Commission which required management activities on the part of the lessor. The partnership continued in existence for about 15 months until it was dissolved by withdrawal of all but one of the partners; it filed partnership information tax returns. The partnership was real and it took the actions necessary to carry out and consummate the basic plan. But, possibly recognizing the difficulty in attacking the validity and separate identity of the partnership, respondent contends that the partnership was simply used as a conduit to transfer the valuable *24 real estate package petitioner had put together from petitioner to Preston, and also to divert the consideration paid by Preston for the package to petitioner's stockholders without paying tax on the gain at the corporate level. Respondent cites , for the proposition that the incidence of taxation depends upon the substance of the transaction and that a sale by one person cannot be transferred for tax purposes into a sale by another by using the latter as a conduit through which to pass title. Respondent also relies on , and , for the proposition that for tax purposes the Government must look at the actualities and determine whether the form employed by the taxpayer for doing business is unreal or a sham and if it is, the Government may disregard a sham entity or an intervening entity that serves no useful purpose except to avoid tax to the taxpayer. And finally respondent cites , affirmed per curiam ; ; ; *25 and other cases as factual situations similar to the factual situation here where this Court has ignored either a controlled entity or an individual who actually received the income and taxed that income to the entity or individual who earned it or was entitled to receive it. We do not dispute the principles for which the above cases are cited but we just do not think they are applicable here. The first component of respondent's "real estate package" was an option to purchase the real estate. The movant in obtaining the option was Arthur, who was both a stockholder of petitioner and a potential partner in West. The option was first taken in the name of Branwyn Co., a straw party, and was then assigned to petitioner. Arthur testified it was assigned to petitioner only to hold until it could be decided who would own the property and carry out the project. Petitioner did nothing with the option but assigned it to West after the partnership was formed for the purpose of carrying out the project. West exercised the option and purchased the land from the optionor on October 19, 1960. On December 19, 1960, when it was decided to liquidate the partnership effective as of December 31, 1962, and *26 to pay Carl, Charles, and Arthur approximately $100,000 as guaranteed payments, and at the time the guaranteed payments were made by the partnership, there was no longer any option in existence and the partnership owned the land. The second component of the "package" was the agreement of the Commission to lease the building to be constructed on the property. The evidence indicates that while Arthur made the first contact with the Commission, both Arthur and Preston negotiated with the Commission and its representatives concerning both the plans for the building and the terms of the lease, and that Stetser, who was a friend of Preston, was aware of the fact that Preston would probably have an ownership interest in the project. While Stetser, acting for the Commission, wrote to petitioner on August 30, 1960, advising of the acceptance of petitioner's construction proposal and indicating that the letter was a "binding commitment to sign a lease," petitioner did nothing further with respect to a lease, and West actually entered into an agreement of lease with the Commission on October 14, 1960. Here again the agreement to lease became meaningless before any mention was made of Preston *27 buying out the other partners, because West had already entered into the lease. The third component of the "package" was a commitment by Society to make a permanent mortgage loan of $750,000 on the property. This commitment was obtained by O'Toole, a mortgage broker, at Arthur's request of September 19, 1960. On the application for this loan, which was signed in petitioner's name by Arthur, the owners of the project were specified as "A corporation or partnership to be formed for this project." However, the commitment was made in a letter dated September 27, 1960, addressed to O'Toole, which referred to petitioner as the borrower. The letter also stated that the commitment would be effective for 14 months from date, and that "formal acceptance must be made by you on or before October 12, 1960." It also required, with the acceptance of the commitment, a deposit of $7,500 which would be retained by Society if the loan was not accepted by November 27, 1961. Neither petitioner nor anyone else "accepted" the loan by October 12, 1960. On November 21, 1960, West delivered $7,500 to O'Toole who used it to make the deposit under the mortgage commitment. It would thus appear to be quite doubtful *28 that petitioner actually owned a mortgage commitment after October 12, 1960, that could have been sold to Preston, although West was not actually substituted for petitioner in the mortgage commitment until November 9, 1961. It was West, however, and not petitioner, who did actually borrow the money. In the cases relied upon by respondent the taxpayer had either signed an agreement to sell the property, or had conducted extensive negotiations regarding a sale with the ultimate purchaser. Anything less than this would seem to be insufficient to bring the transaction within the scope of the Court Holding Co. doctrine. This fact was well summarized in : Certain it is from all of the authorities the sale cannot be attributed to the corporation unless the corporation has, while still the owner of the property, carried on negotiations looking toward a sale of the property, and in most cases the negotiations must have culminated in some sort of sales agreement or understanding so it can be said the later transfer by the stockholders was actually pursuant to the earlier bargain struck n2 by the corporation. * * * [Footnote omitted.] There *29 is no evidence in this case that any negotiations or agreement for sale of the "real estate package" to Preston had even been considered at any time petitioner could be said to have any interest in the "package." As indicated above we are very doubtful that petitioner's "real estate package," which respondent claims it sold to Preston for $97,839.99 would hold together under close scrutiny. But in any event we are convinced from all the evidence that what happened in substance was not the sale of a real estate package by petitioner to Preston but the undertaking on the part of four individuals, Arthur, Carl, Charles, and Preston, to acquire property suitable in location to the Commission, build a building thereon, and enter into a long-term lease with the Commission that would guarantee not only a return of their investment to the ownerpromoters and repayment of their loans, but also a profit over the term of the lease. Petitioner's name and stationery were used during the early stages of the negotiations because they were available and presented a convenient method of handling the correspondence until the individuals decided on the form and entity they were going to use to undertake *30 the project. The partnership, West, was decided upon sometime after the middle of September and was formalized on October 10, 1960. Thereafter the project was undertaken and all actions that were binding on the owners were taken in the name of the partnership. The fact that Arthur, Carl, and Charles subsequently decided to pull out of the partnership and leave the project to Preston does not change the fact that this was a partnership project, the partnership was real, and petitioner had no interest in either the partnership or the project. Of course it can be argued that at one time during the course of the undertaking petitioner-corporation might have sold the real estate package to Preston. But we are not concerned with what it might have done; the incidence of taxation follows what was actually done. ; , reversed on other grounds, ; , affd. . There is no evidence that it was ever intended that petitioner would sell anything. Assuming that petitioner's three stockholders who became *31 partners in West were in control of petitioner, they nevertheless were entitled to either have petitioner enter into the project and reap some of the profit or keep petitioner out of it and make it their own project. There is no specific evidence that petitioner's name as owner made the project any more feasible; and we believe it was understood by all parties concerned that some entity other than petitioner would be the ultimate owner. There is no evidence that the seller of the real estate required an assignment of the option to West before West could exercise the option; the Commission required no assignment of the agreement to lease before entering into the lease with West; and Society did not require any assignment of its commitment to loan money on the property before it made the permanent loan to West. And of course if petitioner owned valuable rights that it could have sold, it is somewhat strange that the fourth stockholder did not insist on petitioner making the sale or at least participating in the partnership - particularly when an initial 50-percent interest in the partnership was owned by someone entirely unrelated to petitioner. In our opinion, based on all the evidence *32 and the realities of the situation, respondent's "real estate package" was never sold by petitioner or anyone else and the payments received by Arthur, Charles, and Carl were just what they were represented to be, guaranteed payments for their interests in the partnership, and that income cannot be attributed to or taxed to petitioner. Decision will be entered for the petitioner.